F I L E D
United States Court of Appeals
Tenth Circuit

OCT 10 2001

PATRICK FISHER
Clerk

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

CHARLES R. TATE,

      Plaintiff-Appellant,

v.

FARMLAND INDUSTRIES, INC.,

      Defendant-Appellee.

No. 99-6329

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. No. CIV-98-1072-L)

Van H. Cline, Norman, Oklahoma, for Plaintiff-Appellant.

Marc Edwards (Sandy L. Schovanec with him on the brief), of Phillips, McFall, McCaffrey, McVay & Murrah, P.C., Oklahoma City, Oklahoma, for Defendant-Appellee.

Before **BRISCOE**, **BALDOCK**, and **LUCERO**, Circuit Judges.

**BALDOCK**, Circuit Judge.

      Defendant Farmland Industries Inc., employed Plaintiff Charles R. Tate

in 1987 to operate a commercial motor vehicle (CMV) hauling propane and other

refined fuel products.[1]  In 1995, Plaintiff began taking antiseizure medication to control focal seizures, episodes of jerking on the left side of his body.  In 1998, Defendant terminated Plaintiff's employment as a CMV operator due to his health condition.  According to Defendant, Plaintiff's use of antiseizure medication rendered him physically unqualified to operate a CMV.

Following his termination, Plaintiff filed this action against Defendant alleging violations of (1) the Americans With Disabilities Act (ADA), 42 U.S.C. §§ 12101-12213, and (2) the Family and Medical Leave Act (FMLA), 29 U.S.C. §§ 2601-2654.  The district court granted summary judgment for Defendant on Plaintiff's ADA claim, and dismissed Plaintiff's FMLA claim for failure to state a cause of action.  Plaintiff appeals.  We exercise jurisdiction under 28 U.S.C. § 1291.  We affirm in part, reverse in part, and remand.

I.

In October 1996, a Department of Transportation (DOT) authorized medical examiner, Dr. Larry G. Stabler, evaluated Plaintiff as required by federal law and issued him a CMV operator's medical certification.  During the examination, Plaintiff disclosed he had been taking the antiseizure medication Dilantin since the fall of 1995 to control focal seizures related to Lyme Disease.  Dr. Stabler

---

[1]  By federal definition, a commercial motor vehicle (CMV) is "used on a highway in interstate commerce" and weighs at least 10,001 pounds. 49 C.F.R. § 390.5.

examined Plaintiff again in November 1997 for recertification. On the medical examination form, Plaintiff again disclosed his use of Dilantin, and, apparently for the first time, also indicated a history of "seizures, fits, convulsions or fainting." Nevertheless, Dr. Stabler certified Plaintiff as physically qualified to operate a CMV.

Upon reviewing Plaintiff's 1997 certification, Defendant's Occupational Health Coordinator (OHC) noticed that Plaintiff's examination record reported a history of seizures. The OHC sent a memo to Plaintiff's supervisor requesting additional information. In the memorandum, the OHC wrote that Plaintiff–

> indicated a "yes" for seizures, convulsions, and for medications, lists Dilantin–an anticonvulsant. Seizures have never been indicated on previous physicals. The physical done a year ago, Dilantin was listed "as precautionary measure for past history of Lyme disease." According to the PDR (drug/medication reference), Dilantin is prescribed only for seizure control.

Responding to Defendant's request for information, Plaintiff's neurologist, Dr. James E. Duncan, sent a letter to Defendant explaining that Plaintiff suffered from focal seizures. Focal seizures are episodes of jerking on the left side of the body without loss of consciousness. Dr. Duncan confirmed that Plaintiff was taking Dilantin, but indicated Plaintiff experienced warning symptoms prior to the onset of a seizure. Dr. Duncan also indicated Plaintiff had not suffered a focal seizure in the past two years.

3

On or about January 2, 1998, Defendant placed Plaintiff on sick leave while determining whether his history of seizures and use of antiseizure medication would permit him to continue working as a CMV operator. Effective January 30, 1998, while Plaintiff remained on sick leave, Defendant officially terminated Plaintiff's employment. According to Defendant, Plaintiff was not physically qualified to operate a CMV because Plaintiff's use of antiseizure medication necessarily prohibited him from meeting the physical requirements for CMV operators.

II.

Subchapter III of the Commercial Motor Vehicle Safety Act, entitled "Safety Regulation," 49 U.S.C. §§ 31131-31148, authorizes the Secretary of Transportation to prescribe "minimum safety standards" to ensure "the physical condition of operators of commercial motor vehicles is adequate to enable them to operate the vehicles safely." Id. § 31136(a)(3). To that end, Department of Transportation (DOT) regulations dictate that "[a] person shall not drive a commercial motor vehicle unless he is physically qualified to do so . . . ." 49 C.F.R. § 391.41(a). Among other things, a person is physically qualified to drive a CMV if that person "[h]as no established medical history or clinical diagnosis of . . . any . . . condition which is likely to cause loss of consciousness or any loss of ability to control a commercial motor vehicle." Id. § 391.41(b)(8).

DOT's interpretation of its own regulations strongly suggests that a driver who is taking antiseizure medication for any reason is not qualified to drive a CMV. Department of Transportation's Federal Highway Administration, Federal Motor Carrier Safety Regulations § 391.41(b)(8), at 411 (Mgmt. ed. 1998) (Medical Advisory Criteria for Evaluation Under 49 C.F.R. Part 391.41) (hereinafter "Medical Advisory Criteria").

III.

The ADA provides in relevant part that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to . . . discharge of employees, . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To establish a prima facie case of discrimination under the ADA, a plaintiff must demonstrate "'(1) that [he] is disabled within the meaning of the ADA; (2) that [he] is qualified–with or without reasonable accommodation; and (3) that [he] was discriminated against because of [his] disability.'" McKenzie v. Dovala, 242 F.3d 967, 969 (10th Cir. 2001) (quoting Aldrich v. Boeing Co., 146 F.3d 1265, 1269 (10th Cir. 1998)). The ADA defines the term "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2).

In granting summary judgment for Defendant on Plaintiff's ADA claim,[2] the district court focused on the question of whether Plaintiff was disabled within the meaning of the ADA. The court concluded Plaintiff was not disabled because he failed to establish he was "substantially limited" in the "major life activity" of working. Furthermore, the district court concluded Defendant did not "regard" Plaintiff as disabled, but instead perceived him only as unable to obtain CMV certification under DOT's Medical Advisory Criteria. We need not decide, however, whether Defendant was disabled as required under the first prong of the ADA's prima facie case. Rather, we conclude as a matter of law that Plaintiff cannot satisfy the second prong of the prima facie case because he could not meet Defendant's physical requirements for CMV operators, and thus was not qualified to operate a CMV.[3] See Mathews v. The Denver Post, __ F.3d __, __, 2001 WL 967797 at *2 (10th Cir. 2001) (declining to consider whether plaintiff was disabled under the ADA where he was not qualified for the desired position).

---

[2] We review the district court's grant of summary judgment under Fed. R. Civ. P. 56 de novo, applying the same legal standard as the district court. Watson v. Beckel, 242 F.3d 1237, 1239 (10th Cir. 2001).

[3] While the district court did not address the second prong of the ADA's prima facie case, which requires a showing that Plaintiff is qualified for the desired position, we may affirm on any ground supported by the record. See Gowan v. United States Dep't of the Air Force, 148 F.3d 1182, 1189 (10th Cir. 1998).

A.

The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).[4] As a condition to performing the essential functions of an employment position, however, an individual must first satisfy "the requisite skill, experience, education and other job-related requirements of the employment position." 29 C.F.R. § 1630.2(m). If a plaintiff fails to establish that he has met either step of this analysis, he is not a "qualified individual" within the meaning of § 12111(8). See Basith v. Cook County, 241 F.3d 919, 927 (7th Cir. 2001) (explaining that the question of whether someone is a "qualified individual with a disability" involves a two-step inquiry); Garcia-Ayala v. Lederle Parenterals, Inc., 212 F.3d 638, 646 (1st Cir. 2000) (same); Weber v. Strippit, Inc., 186 F.3d 907, 916 (8th Cir. 1999) (same); Foreman v. Babcock & Wilcox Co., 117 F.3d 800, 810 n.14 (5th Cir. 1997) (same).

_____

[4] Plaintiff appears to seek no position with Defendant other than CMV operator, and has suggested no means by which Defendant could reasonably accommodate him other than by simply accepting his medical certification. See Smith v. Midland Brake, Inc., 180 F.3d 1154, 1171-72 (10th Cir. 1999) (en banc) (employee bears the initial responsibility of expressing a desire for reassignment if no reasonable accommodation is possible in his present position). Instead, Plaintiff steadfastly maintains that he can perform the essential functions of a CMV operator, and that Defendant has no authority to override his CMV certification.

The question of whether a job requirement is a necessary requisite to employment initially focuses on whether an employer actually requires all employees in the particular position to satisfy the alleged job-related requirement. Cf. Milton v. Scrivner, Inc., 53 F.3d 1118, 1124 (10th Cir. 1995) (holding under the ADA that an essential function of a job must be actually required of all employees in the particular position). This inquiry is not intended to second guess the employer or to require the employer to lower company standards. Id.; see also H. Rep. No. 101-485(II), at 55 (1990), reprinted in 1990 U.S.S.C.A.N. 303, 337 (The ADA "does not undermine an employer's ability to choose and maintain qualified workers."). Provided that any necessary job specification is job-related, uniformly-enforced, and consistent with business necessity, the employer has the right to establish what a job is and what is required to perform it.

The foregoing is consistent with the ADA's legislative history, which speaks directly to an employer's application of DOT's physical standards to CMV operators:

> With respect to covered entities subject to rules promulgated by the Department of Transportation regarding physical qualifications for drivers of certain classifications of motor vehicles, it is the Committee's intent that <u>a person with a disability applying for or currently holding a job subject to these standards must be able to satisfy any physical qualification standard that is job related and consistent with business necessity in order to be considered a qualified individual with a disability</u> . . . ."

8

H. Rep. No. 101-485(II), at 57, <u>reprinted in</u> 1990 U.S.C.C.A.N. at 339 (emphasis

added).  Indeed, DOT regulations mandate that an employer "not require or permit

a person to drive a commercial motor vehicle unless that person is qualified to

drive a commercial motor vehicle."  49 C.F.R. § 391.11(a).

B.

DOT regulations state that a person is physically qualified to drive a

CMV if that person has no clinical diagnosis of a condition likely to cause

"loss of ability to control" a CMV.  49 C.F.R. § 391.41(b)(8).  As a supplement

to DOT regulations, DOT's Medical Advisory Criteria set forth in detail DOT's

recommended physical qualifications for CMV operators.  The Medical Advisory

Criteria strongly suggest that persons taking antiseizure medication, whether for

epilepsy or other medical reason, cannot be qualified to drive CMVs.  Medical

Advisory Criteria § 391.41(b)(8), at 411.[5]  According to the Medical Advisory

---

[5]  DOT's interpretation of § 391.41(b)(8) reads in relevant part:

§ 391.41(b)(8)–A person is physically qualified to drive a
commercial motor vehicle if that person:

Has no established medical history or clinical diagnosis of
epilepsy;

<u>or</u>

Any other condition which is likely to cause the loss of
consciousness; or any loss of ability to control a commercial

(continued...)

Criteria, the decision as to medical certification should be individualized only where a person who has had a nonepileptic seizure is <u>not</u> taking antiseizure medication. Otherwise, such individual is not qualified to operate a CMV. <u>See</u> 29 C.F.R. § 1630.2(n)(2)(i) (a job function may be considered essential because the reason the position exists is to perform the function).

---

<sup>5</sup>(...continued)
motor vehicle. [emphasis in original].

Epilepsy is a chronic functional disease characterized by seizures or episodes that occur without warning, resulting in loss of voluntary control which may lead to loss of consciousness and/or seizures. Therefore, <u>the following drivers cannot be qualified</u>:

 1. a driver who has a medical history of epilepsy; or
 2. a driver who has a current clinical diagnosis of epilepsy; or
 3. <u>a driver who is taking antiseizure medication</u>.

<u>If an individual has had a nonepileptic seizure</u> or an episode of loss of consciousness of unknown cause <u>which did not require antiseizure medication, the decision as to whether that person's condition may result in the loss of consciousness or loss of ability to control a motor vehicle is made on an individual basis</u> by the medical examiner in consultation with the treating physician. . . .

In those individual cases where a driver had a <u>nonepileptic seizure</u> or an episode of loss of consciousness <u>that resulted from a known medical condition</u> (e.g., drug reaction, high temperature, acute infectious disease, dehydration, or acute metabolic disturbance), <u>certification should be deferred until the driver</u> has fully recovered from that condition, has no existing residual complications, and <u>is not taking antiseizure medication</u>. [emphasis added].

10

Admittedly, DOT's Medical Advisory Criteria are prefaced with a note indicating they are only advisory and nonbinding.[6] Nevertheless, the views of an agency such as DOT implementing a regulatory scheme designed to ensure the safety of our nation's highways "'constitute a body of experience and informed judgment'" to which employers may properly resort for guidance. United States v. Mead Corp., 121 S. Ct. 2164, 2171 (2001) (quoting Skidmore v. Swift & Co., 323 U.S. 134, 139-40 (1944)). We hesitate to second guess a legitimate business judgment on the part of DOT and its covered employers as to the necessary qualifications of CMV operators. As then Chief Judge, now Justice Breyer opined: "We doubt that . . . the Department [of Transportation] could not adopt reasonable rules concerning the relationship between certain handicaps . . . and certain activities like driving." Ward v. Skinner, 943 F.2d 157, 161-164 (1st Cir. 1991) (Breyer, C.J.) (upholding DOT's refusal to provide

---

[6] The Medical Advisory Criteria are prefaced with a note that states in relevant part:

> Unlike regulations which are codified and have a statutory base, the recommendations in this advisory are simply guidance established to help the medical examiner determine a driver's medical qualifications pursuant to § 391.41 of the Federal Motor Carrier Safety Regulations (FMSCRs). . . . The medical examiner may, but is not required to, accept the recommendations. Section 390.3(d) of the FMSCRs allows employers to have more stringent medical requirements.

Medical Advisory Criteria at 407.

11

a truck driver taking antiseizure medication "an individualized inquiry that would permit him to escape the application of a general agency rule" embodied in a task force recommendation).  We have little difficulty concluding that Defendant may rely on a reasonable interpretation of DOT's Medical Advisory Criteria, which undoubtedly are job-related and consistent with Defendant's safety and liability concerns, to establish physical requirements for its CMV operators, provided Defendant does so consistently and uniformly.[7]  Subject to DOT's minimum standards, Defendant as the employer has the prerogative of determining what is physically required of its CMV operators.  See 49 C.F.R. § 390.3(d) (employers may mandate "more stringent requirements relating to safety of operation and employee safety and health").

---

[7]  This case is quite similar to Murphy v. United Parcel Serv., Inc., 946 F. Supp. 872 (D. Kan. 1996), aff'd, No. 96-3380, 1998 WL 105933 (10th Cir. 1998) (unpublished), aff'd, 527 U.S. 516 (1999).  In that case, plaintiff's job as a mechanic required him to drive UPS tractor-trailers for road tests and repair calls. DOT regulations, namely 49 C.F.R. § 391.41(b)(6), provided that a person with a current clinical diagnosis of high blood pressure was not physically qualified to drive a CMV.  The same Medical Advisory Criteria upon which Defendant relied in this case described high blood pressure as greater than 160/90.  Plaintiff, who suffered from high blood pressure, could not take the amount of medication necessary to lower his blood pressure to that level without further damaging his health.  Although plaintiff had obtained a licensed physician's medical certification to drive, the district court concluded, based upon DOT's Medical Advisory Criteria, that plaintiff was not qualified to operate a CMV within the meaning of the ADA.

12

C.

In this case, Defendant's independent review of Plaintiff's status led to the conclusion that Plaintiff was not physically qualified to operate a CMV under established safety standards. Plaintiff argues however, that Defendant cannot override his medical examiner's certification. While we are not unsympathetic to Plaintiff's circumstance, we disagree. Due to legitimate safety and liability concerns, Defendant maintains a policy of requiring CMV operators to qualify to operate CMVs in compliance with DOT's physical requirements–including those requirements set forth in § 391.41(b)(8) of the Medical Advisory Criteria.[8] See Chandler v. City of Dallas, 2 F.3d 1385, 1395 (5th Cir. 1993) ("Woe unto the employer who put . . . an [unqualified] employee behind the wheel of a vehicle owned by the employer which was involved in a vehicular accident.").

Although Defendant acknowledged during discovery that Plaintiff could perform the essential functions of a CMV operator while taking the prescribed dosage of Dilantin, the fact that Plaintiff must take Dilantin to control focal seizures necessarily renders Plaintiff unable to meet a job-related requirement of the employment position, a requirement established by Defendant under DOT's

---

[8] The record contains no evidence to suggest Defendant treated Plaintiff differently than other CMV operators in its employ, or used DOT standards as a pretext to terminate Plaintiff.

standards.  See Ward, 943 F.2d at 161-64 (noting the risk of seizure to an epileptic taking antiseizure medication "is low only if the individual actually takes his medicine; he may forget").  Because Plaintiff cannot meet the necessary job-related physical requirements to perform as a CMV operator in Defendant's employ, he is not a "qualified individual with a disability" as defined in 42 U.S.C. § 12111(8).  Accordingly, the district court properly granted summary judgment in favor of Defendant on Plaintiff's ADA claim.

IV.

Plaintiff also challenges the district court's dismissal of his FMLA claim involving the period of time immediately following his termination.  Plaintiff argues Defendant terminated him without first providing him "sick leave" to which he was entitled under the FMLA.  The FMLA provides in relevant part:

> an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period for one or more of the following:
> . . .
>   (D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

29 U.S.C. § 2612(a)(1)(D).  A "serious health condition" includes "an illness, injury, impairment, or physical or mental condition that involves . . . continuing treatment by a health care provider."  Id. § 2611(11)(B).

A.

In his first amended complaint, Plaintiff alleged "[d]efendant knew that

at all times relevant, up to and including the termination of his employment, plaintiff was taking the medication Dilantin prescribed by his treating neurologist." Plaintiff further alleged:

> Defendant regarded plaintiff to be unfit to perform his job because of a serious health condition. Defendant had placed plaintiff on sick leave, and he was on sick leave when defendant fired him. At the time of said firing, plaintiff still had accrued sick leave remaining. Nonetheless, defendant did not provide plaintiff with notice of his rights under the FMLA and did not provide him leave as required by the FMLA.

See Plant v. Morton Int'l, Inc., 212 F.3d 929, 934-36 (6th Cir. 2000) (employee not precluded from asserting an FMLA claim where he would have been unable to return to work within a twelve-week period following his termination).

In dismissing Plaintiff's FMLA claim, the district court concluded that Plaintiff failed to allege the necessary elements to maintain an action under the FMLA.[9] To be an "eligible employee" under § 2612(a)(1)(D), a claimant must have worked 1,250 hours in the twelve months immediately preceding his employer's alleged violation of the FMLA. Id. § 2611(2)(A)(ii).[10] As the district court noted, Plaintiff's complaint failed to allege this time requirement.

---

[9] We review a complaint's dismissal under Fed. R. Civ. P. 12(b)(6) for failure to state a claim de novo. Aguilera v. Kirkpatrick, 241 F.3d 1286, 1292 (10th Cir. 2001).

[10] To be covered under the FMLA, an employer must employ fifty or more people and engage in interstate commerce. Stoops v. One Call Communications, Inc., 141 F.3d 309, 311-12 (7th Cir. 1998) (citing 29 U.S.C. § 2611(2)). Defendant does not deny that it is a "covered" employer under the FMLA.

15

Such failure, however, is a technical defect easily cured by amendment.

Plaintiff alleged generally that from March 1996 until his termination in January 1998, Defendant employed him as a truck driver. We infer from this allegation that Plaintiff satisfied the time requirement under § 2611(2)(A)(ii). Therefore, Plaintiff's failure to specifically reference the 1,250-hour time requirement in his complaint does not warrant dismissal of Plaintiff's FMLA claim with prejudice. See Curley v. Perry, 246 F.3d 1278, 1281-82 (10th Cir. 2001) ("[D]ismissal under Rule 12(b)(6) without affording the plaintiff notice or an opportunity to amend is proper only when it is 'patently obvious' that the plaintiff could not prevail on the facts alleged, and allowing him an opportunity to amend his complaint would be futile.").

## B.

The district court also reasoned that Plaintiff failed to allege he requested FMLA benefits from Defendant. The district court concluded such an allegation was necessary to maintain an action under the FMLA because "[i]t is axiomatic that defendant cannot have denied benefits that were never sought." The FMLA, however, does not require a covered employee to specifically ask for FMLA benefits. An employee need not expressly assert rights under the FMLA or even mention the FMLA. See 29 C.F.R. §§ 825.302(c), 825.303(b); Manuel v. Westlake Polymers Corp., 66 F.3d 758, 761-64 (5th Cir. 1995). If the employer

16

is on notice that the employee might qualify for FMLA benefits, the employer has a duty to notify the employee that FMLA coverage may apply. See 29 C.F.R. § 825.208(a). Pending its review of Plaintiff's health status, Defendant placed Plaintiff on involuntary sick leave. Thus, Defendant was clearly on notice that Plaintiff might qualify for FMLA benefits since Defendant triggered Plaintiff's leave. Given Plaintiff's allegation that Defendant placed him on sick leave, Plaintiff need not allege he provided Defendant with notice of his rights under the FMLA.[11]

## C.

Despite the foregoing, Defendant argues that Plaintiff did not have a serious health condition as required under 29 U.S.C. § 2612(a)(1)(D). Rather, Defendant points to Plaintiff's insistence that he is able to perform his job as a CMV operator despite his medical condition. Nevertheless, the complaint alleges

---

[11] The district court further suggested that Plaintiff had no private cause of action against Defendant for violation of "the FMLA's notice requirements." The FMLA's notice requirements on which the district court relied to support its suggestion, however, are not involved in this case. Plaintiff did not allege a violation of the notice-posting requirements set forth in 29 U.S.C. § 2619. Rather, Plaintiff claims Defendant's failure to personally notify him of his FMLA rights in connection with his termination constituted interference with those rights under 29 U.S.C. § 2615(a)(1). Section 2615(a)(1) of the FMLA prohibits an employer from interfering with the exercise or attempt to exercise any right provided by the FMLA. Section 2617(a)(2), in turn, authorizes an eligible employee to bring a civil action against an employer for violating § 2615. Id. § 2617(a)(2). Accordingly, if sufficiently plead, Plaintiff may maintain a private cause of action for a violation of his FMLA rights.

17

that Defendant considered Plaintiff "unfit" to operate a CMV "because of a serious health condition." The FMLA's definition of a "serious health condition" includes a "physical . . . condition that involves . . . continuing treatment by a health care provider." Indeed, Defendant placed Plaintiff on involuntary sick leave precisely because he has a health condition which requires a physician's continuing treatment. We doubt that many employees placed on involuntary leave for health reasons would consider themselves unable to perform their job. Common sense tells us that this view does not render such employees unable to assert their leave rights under the FMLA.

D.

While we express no opinion on the ultimate outcome of Plaintiff's FMLA claim, we cannot conclude under these circumstances that Plaintiff failed to allege sufficient facts in his first amended complaint to state such a claim. Accordingly, the district court erred in dismissing Plaintiff's FMLA claim under Fed. R. Civ. P. 12(b)(6) with prejudice.

AFFIRMED in part, REVERSED in part, and REMANDED.

**No. 99-6329, <u>Tate v. Farmland Industries, Inc.</u>**

**BRISCOE**, Circuit Judge, dissenting:

I respectfully dissent. First, I would conclude Tate was qualified because Farmland conceded that issue in a request for admission. Second, I would conclude there was a genuine issue of material fact as to whether Tate was regarded as disabled by Farmland. Third, Tate cannot state a claim under the FMLA because his only argument on appeal is that he had a nonlimiting medical condition that was perceived as limiting.

As stated by the majority, to establish a prima facie case of discrimination under the ADA, a plaintiff must demonstrate, "'(1) that [he] is disabled within the meaning of the ADA; (2) that [he] is qualified – with or without reasonable accommodation; and (3) that [he] was discriminated against because of [his] disability.'" <u>McKenzie v. Duvall</u>, 242 F.3d 967, 969 (10th Cir. 2001) (quoting <u>Aldrich v. Boeing Co.</u>, 146 F.3d 1265, 1269 (10th Cir. 1998)). <u>See</u> Majority Op. at 5. Tate contends he was disabled as defined by the ADA because Farmland regarded him as having a physical impairment that limited one or more of his major life activities. <u>See</u> 42 U.S.C. § 12102(2)(c). He argues throughout that he does not have a limiting impairment.

I.

The majority concludes that Tate was not a "qualified individual" as defined by the ADA. Whether a person is "qualified" under the ADA is a two-step analysis:

> First, we must determine whether the individual could perform the *essential functions* of the job, i.e., functions that bear more than a marginal relationship to the job at issue. Second, if (but only if) we conclude that the individual is not able to perform the essential functions of the job, we must determine whether any reasonable accommodation by the employer would enable him to perform those functions.

Milton v. Scrivner, Inc., 53 F.3d 1118, 1123 (10th Cir. 1995) (emphasis added). In response to Tate's first set of requests for admission, Farmland admitted "that at the time [Tate's] employment was terminated by [Farmland], [Tate] was physically and mentally able to perform the *essential functions* of his job with [Farmland]." Aplt. App. at 233 (emphasis added). This admission tracks the language in Milton. Although Tate argued before the district court that this admission was binding, Farmland did not formally address the issue. It only discussed the merits of whether Tate was a qualified individual. Similarly, the district court ruled on the merits. On appeal, notwithstanding this admission, Farmland argues that one of the "essential functions" of Tate's job was meeting the heightened "physical" standards set forth by the DOT regulations. See Aple. Br. at 10.

Once a party makes an admission, the fact is "conclusively established." See Fed. R. Civ. P. 36(b). A party may not obtain relief from its admission unless "the court on motion permits withdrawal or amendment of the admission." Id. Farmland does not argue it should not be bound by its admission. Absent such relief being granted by the district court, it has been conclusively established that Tate was a

2

"qualified individual" as defined by the ADA.[1]

## II.

There are two ways a plaintiff can show he or she was "regarded as" having a disability. First, he or she can show "a covered entity mistakenly believes that the person has a physical impairment that substantially limits one or more major life activities." Doyal v. Okla. Heart, Inc., 213 F.3d 492, 499 (10th Cir. 2000) (internal quotations omitted). Second, he or she can show "a covered entity mistakenly believes that the person's actual nonlimiting impairment substantially limits one or more major life activities." Id.

Tate invokes the latter. Although before the district court he only contended he "was regarded by [Farmland] to have a physical impairment that substantially limited one or more of his major life activities," Aplt. App. at 207, on appeal he tailors his contention to better conform with case authority by contending "Farmland mistakenly believed Tate's nonlimiting medical condition substantially limited one or more of his major life activities." Aplt. Br. at 28. For Tate to recover under this theory, "it is

---

[1] In response to a requested admission "that at the time his employment was terminated by [Farmland], [Tate] had all governmental licenses and certifications necessary for him to perform his job with [Farmland]," Farmland "[a]dmitted that [Tate] held a DOT Certification Card, but he was not a qualified driver under DOT Regulations and FHA regulations and interpretations." Aplt. App. at 232. It is questionable whether this response could negate the previously-quoted admission which refers to Tate's ability to perform the essential function of his Farmland job. At best, there is a genuine issue of material fact as to whether Tate was qualified.

3

necessary that [the employer] entertain misperceptions about the individual – it must believe . . . that [the individual] has a substantially limiting impairment when, in fact, the impairment is not so limiting." Doyal, 213 F.3d at 499.

To prevail on his claim that there was a genuine issue of material fact as to whether he was regarded as disabled, Tate must identify the "nonlimiting medical condition" he was perceived as having, and the "major life activity" it was perceived to substantially limit. On appeal, Tate alleges three major life activities were implicated – working, driving, and maintaining consciousness. We should not consider "maintaining consciousness" because Tate did not assert this claim before the district court. We need not determine whether "driving" is in itself a major life activity because working is clearly a major life activity under the ADA. See Davoll v. Webb, 194 F.3d 1116, 1134 n. 11 (10th Cir. 1999). Since Tate has identified one recognized major life activity, I next address whether he had a nonlimiting medical condition that was perceived as substantially limiting his ability to work.

Was Tate's taking of Dilantin the medical condition that was nonlimiting, but perceived by Farmland as limiting? Farmland first had information that Tate was taking Dilantin in November 1996 when it received the 1996 certificate provided by Tate's medical examiner. In response to the instruction to "[l]ist all drugs or medications taken regularly," the following is written: "Dilantin 400qd – as precautionary measure for past history of Lymes Disease." Aplt. App. at 115.

4

Farmland, however, took no action at that time. Tate's file was flagged and a memorandum was sent by the occupational health coordinator to two safety managers because of a discrepancy between the 1996 and 1997 certificates. On the 1997 certificate, Tate checked the "Yes" box for "[s]eizures, fits, convulsions or fainting" and as an explanation stated he had seizures that resulted from Lymes Disease. Aplt. App. at 118. The "No" box had been checked for 1996. The 1997 certificate also noted Tate still was taking 400 milligrams of Dilantin per day. Out of concern raised by Tate's notation regarding seizures, Farmland researched the medication and noted Dilantin "is prescribed only for seizure control." Aplt. App. at 335.

The evidence suggests that Farmland was not concerned exclusively with Tate's intake of Dilantin. Rather, Farmland was concerned that Tate suffered from a "medical condition" and that Dilantin was taken to combat the seizures resulting from that medical condition. Tate argued before the district court and argues on appeal that he was fired "because of [Farmland's] misperceptions of his medication and medical condition." Aplt. App. at 207; Aplt. Br. at 5. On appeal, he continues his focus on both the medication and his medical condition.

The district court granted summary judgment to Farmland because (1) Farmland "viewed [Tate] as not being certifiable" rather than being disabled, and (2) Farmland did not view him as disqualified from a class of jobs or a broad range of jobs. Aplt. App. at 754. However, whether Tate was certifiable "goes only to whether [he] is

5

qualified and whether [Farmland] has a defense based on the DOT regulations."
Murphy, 527 U.S. at 522-23. Accordingly, the district court's emphasis on qualifications when discussing disability was error.

Rather, the district court's focus should have been on whether the plaintiff showed that the employer believed he had "a substantially limiting impairment when, in fact, the impairment is not so limiting." Doyal, 213 F.3d at 499 (quotation omitted). "[T]he EEOC defines 'substantially limits' as: 'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.'" Murphy, 527 U.S. at 523 (quoting 29 C.F.R. § 1630.2(j)(3)(i) (1998)). "The evidence that petitioner is regarded as unable to meet the DOT regulations is not sufficient to create a genuine issue of material fact as to whether petitioner is regarded as unable to perform a class of jobs utilizing his skills." Id. at 524. Accordingly, Tate must be able to show that Farmland perceived him as significantly restricted from performing either a class of jobs or a broad range of jobs.

Viewing the facts in the light most favorable to Tate, there is a genuine issue of material fact as to whether he was perceived as significantly restricted from performing a broad range of jobs. Jack Curry, Farmland's manager of hazardous materials and safety, stated that Farmland owned several non-commercial motor vehicle trucks and that he believed it would have been unsafe for Tate to drive one of those trucks. Aplt.

6

App. at 310-11.  This evidence indicates Farmland perceived Tate as restricted from performing a broad range of jobs.

III.

The majority concludes that Farmland was on notice that Tate might qualify for FMLA benefits when Farmland placed him on involuntary leave for health reasons.  The majority reverses the district court's dismissal of Tate's FMLA claim and remands for further consideration.  The FMLA entitles an "eligible employee" "to a total of 12 workweeks of leave during any 12-month period" when the employee has "a serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D).  I would affirm the district court's dismissal of the FMLA claim because Tate does not allege his health condition made him unable to perform the functions of his position.

I agree with the majority that Tate's failure to allege he was an eligible employee should not result in dismissal with prejudice of his claim.  The second step in determining whether Tate can invoke the FMLA is evaluating whether he had a "serious health condition," as defined by the statute, that made him unable to perform the functions of his position.  For purposes of the Act, the term "serious health condition" means:

> an illness, injury, impairment, or physical or mental condition that
> involves –
>     (A) inpatient care in a hospital, hospice, or residential

7

medical care facility; or

(B) continuing treatment by a health care provider.

29 U.S.C. § 2611(11). Tate argued before the district court that his "medical condition and his physician's continuing treatment of it with the prescription medication, Dilantin, constituted a 'serious health condition' under the FMLA." Aplt. App. at 741. Arguably, seizures are a serious health problem. To have standing under the FMLA, however, the serious health condition must "make[] the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). Tate satisfied this standing requirement by summarily pleading that his seizures were a serious health condition which required him to miss work for three or more consecutive days.[2] However, as regards his FMLA claim, Tate has consistently argued that despite his medical condition he was able to perform the functions of his job, Aplt. App. at 720 ¶ 9(f), Aplt. Br. at 22, and that Farmland fired him because it perceived him as "disabled" and "medically disqualified" to perform his job. Aplt. App. at 720 ¶ 9(e). Tate essentially asserted his FMLA claim as an alternative claim should the court conclude he was not "medically qualified" to perform his job when he was fired. Id. ¶ 9(h).

On appeal, Tate proceeds under the theory that Farmland regarded him as

---

[2] Missing more than three consecutive calendar days of work is a required showing for someone who contends he or she is undergoing continuing treatment for an illness. See 29 C.F.R. § 825.800.

8

disabled; specifically, that he had a nonlimiting condition that Farmland perceived as limiting. Aplt. Br. at 55. There is no provision of the FMLA that would allow him to recover because he was only "regarded as" having a serious medical condition that made him unable to perform his job when he actually did not.

I would reverse the district court's grant of summary judgment on the ADA claim and affirm the district court on the FMLA claim.